**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICK MICHAEL CIPOLLA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN, Acting** | : | |
| **Commissioner, Social Security** | : | |
| **Administration** | : | **NO. 16-2664** |

## MEMORANDUM OPINION

**Savage, J.**                                                          **March 13, 2018**

Seeking review of the decision denying his claim for Supplemental Security Income (SSI) benefits, plaintiff Patrick Cipolla asserts that the administrative law judge (ALJ) committed two legal errors.[1]  First, he argues that the ALJ did not properly assess his Global Assessment of Functioning (GAF) scores.  Second, he contends the ALJ improperly evaluated the medical opinion evidence.

Having independently reviewed the record, we conclude that the ALJ did properly consider and assess the GAF scores.  However, he did not accord the appropriate weight to Cipolla's treating physicians' opinions while improperly relying on a non-examining consultant's opinion that was not supported by the evidence.  Therefore, we shall remand to the Commissioner.

### Factual Background

Cipolla is a sixty-one-year-old, high-school educated male who suffers from severe depression.[2]  He last worked full-time as a waiter before quitting in 2006 to care

---

[1] The defendant's Appeals Council summarily denied Cipolla's request for review, making the ALJ's decision the final decision of the Commissioner.

[2] R. at 149–54.

for his ailing mother.[3]   Though Cipolla reported feeling "low" for many years, his depression symptoms worsened once his mother's condition began to deteriorate, and intensified upon her death in 2011.[4]

 Cipolla first sought mental health treatment for depression in August 2010 at Northwestern Human Services (NHS).[5]   His first recorded examination was in September 2010 with Dr. Jamil Bhatti who assigned Cipolla a GAF score of 50.[6]

Cipolla continued to visit NHS regularly where he was seen by different physicians.   Dr. Marija Petrovic's treatment notes of August 24, 2011 assigned her patient a GAF score of 45.[7]   She then saw Cipolla five times between October 6, 2011 and February 9, 2012.[8]   She did not assign GAF scores on these appointments.   Cipolla continued to treat at NHS with Dr. Harold Graff, who saw him on September 4, 2012, January 10, 2013, January 14, 2013, and June 23, 2014.[9]

In the meantime, in October 2011, state agency examiner Dr. Ujwala Dixit completed a medical report and form opining on Cipolla's functional capacity based, in part, on Dr. Bhatti's September 2010 evaluation done at NHS.[10]   Dr. Dixit, noting a GAF score of 50, found no impairments to his ability to understand, remember, and carry out

---

[3] *Id.* at 153–54.

[4] *Id.* at 258.

[5] ALJ Hearing Decision (ALJ Op.) at 15; R. at 37.

[6] R. at 223–25.

[7] *Id.* at 293–98.

[8] *Id.* at 401–13.

[9] *Id.* at 385–92, 397–98, 643–46.

[10] *Id.* at 263–71.

instructions due to his depression.[11]  She did, however, document impairments to his daily living activities.[12]  Notably, Dr. Dixit did not opine whether Cipolla's condition caused any impairment to his work capacity.[13]

Cipolla suffered from his first major depressive episode on January 14, 2013 and was admitted to Mercy Fitzgerald Hospital.[14]  When the hospital physician, Douglas Kovatch, examined him two days later, he noted that Cipolla was cooperative, well groomed, anxious, and depressed.  He recorded a GAF score of 20.[15]  Upon discharge on January 18, 2013, the GAF score was 50.[16]

On May 7, 2013, Cipolla was examined by state psychologist Noa Glick.[17] Based on her interview with Cipolla and a review of his NHS treatment notes, Glick gave Cipolla a GAF score of 51.[18]  Yet, she noted moderate and marked limitations in Cipolla's ability to carry out work-related tasks due to his condition.[19]  A week later, a state non-examining evaluator, Sandra Banks, found that despite limitations in his ability to understand and remember complicated instructions, Cipolla could maintain concentration and appropriate behavior in production-oriented jobs.[20]  Her opinion was

---

[11] *Id.* at 263, 270.

[12] *Id.* at 264.

[13] *Id.* at 263.

[14] *Id.* at 299.

[15] *Id.* at 301–02.

[16] *Id.* at 299.

[17] *Id.* at 356–66.

[18] *Id.* at 360.

[19] *Id.* at 364–65.

[20] *Id.* at 74.

based solely on a review of some of Cipolla's medical records, including those from Mercy Fitzgerald Hospital, Dr. Graff, Dr. Dixit, and Dr. Robin Lowey and Associates.[21]

In August 2013, Cipolla returned to NHS.[22]  In addition to assigning Cipolla a GAF score of 45, Dr. Nwe Oo found that he suffered from marked to extreme functional limitations due to his mental impairment.[23]  Dr. Oo examined him later in October and December 2013.[24]

Cipolla's second major depressive episode occurred on July 3, 2014 when he was again admitted to Mercy Fitzgerald Hospital for six days.[25]  At admission, Dr. Lee Silverman recorded a GAF score of 30.[26]  By July 8, 2014, Dr. Shelly Oxenhorn documented a GAF score of 45.[27]  After discharge, Cipolla continued treatment at NHS until August 2014.[28]  At his last recorded visit on August 21, 2014, Cipolla reported that things were going well.[29]  His weekly therapy sessions were then reduced to every other week.  The therapist also instructed Cipolla to call the crisis center if his social security disability application was denied.[30]  The record did not contain any subsequent treatment notes.

---

[21] *Id.* at 65–72.

[22] *Id.* at 374–82, 510.

[23] *Id.* at 382, 510.

[24] *Id.* at 367–70, 648–51.

[25] *Id.* at 511.

[26] *Id.* at 513–14.

[27] *Id.* at 544.

[28] *Id.* at 621–33.

[29] *Id.* at 621–22.

[30] *Id.* at 622.

## Procedural Background

Cipolla applied for SSI on March 15, 2013, alleging disability as of August 23, 2010 due to depression and high blood pressure.[31] The Social Security Administration rejected the application on May 16, 2013.[32] Cipolla requested a hearing, which took place on September 10, 2014.[33]

The ALJ, in denying Cipolla's application, made the following findings in his October 28, 2014 decision:

- Cipolla has not engaged in substantial gainful activity since March 15, 2013, the application date;

- Cipolla has the following severe impairment: major depressive disorder;

- Cipolla does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

- Cipolla has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Cipolla is limited to work involving only simple, routine tasks (reasoning level not to exceed 2), no more than occasional contact with the public, coworkers, and supervisors, and no work on assembly lines or in teams with little change in the work setting or work processes;

- Cipolla is unable to perform any past relevant work;

- Cipolla was born on January 12, 1957, and was 56 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed;

---

[31] *Id.* at 37, 131–39, 150–53. Cipolla's SSI application indicates that his alleged onset date was February 10, 2011. *Id.* at 149. During the hearing, Cipolla's counsel made a formal request to amend the onset date to August 23, 2010. *Id.* at 37.

[32] *Id.* at 79–83.

[33] *Id.* at 28.

- Cipolla has at least a high school education and is able to communicate in English;

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Cipolla is "not disabled," whether or not Cipolla has transferable job skills;

- Considering Cipolla's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Cipolla can perform; and

- Cipolla has not been under a disability, as defined in the Social Security Act, since March 15, 2013, the date the application was filed.[34]

After the Appeals Council denied review of the ALJ's decision on April 4, 2016, Cipolla timely appealed to this court.[35] The case was referred to a magistrate judge for a report and recommendation. The magistrate judge found that the ALJ had provided a rational explanation as to why the different GAF scores were not dispositive of Cipolla's ability to work.[36] She also concluded that the ALJ properly weighed each medical opinion and did not err in not according deference to the NHS physicians as treating physicians.[37] Cipolla filed objections to the R & R.

### Standard of Review

On judicial review, the court determines whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is " 'more than a mere

---

[34] *See generally* ALJ Op.

[35] R. at 1–3.

[36] Report & Recommendation (R & R) (Doc. No. 18) at 7.

[37] *Id.* at 15–21.

scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate.' " *Thomas v. Comm'r of Soc. Sec. Admin.,* 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir. 1999)).

The ALJ has a duty to evaluate all relevant evidence in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 704, 706 (3d Cir. 1981). He must explain the evidence supporting his findings and the reasons for discounting the evidence he rejects. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); *Cotter*, 642 F.2d at 705–06. Otherwise, the reviewing court cannot determine whether significant probative evidence was improperly rejected or ignored. *Burnett*, 220 F.3d at 121; *Cotter*, 642 F.2d at 706–07.

### GAF Scores

Cipolla argues that the ALJ did not meaningfully consider and weigh his consistently low GAF scores, which he contends show serious functional impairment.[38] We disagree. The ALJ did consider the GAF scores together with the medical evidence. He explained why the scores were not indicative of serious depressive symptoms.

A GAF score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning. . . ." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM–IV–TR)* 32 (4th ed. 2000). It is the physician's subjective assessment of the patient's condition at the time of the examination. It is not measured by objective tests. It does not necessarily reflect the patient's condition before and after that moment.

---

[38] *See* Pl.'s Obj. to R & R (Pl.'s Obj.) (Doc. No. 19) at 5–7.

GAF scores do not have the significance they once had in the disability determination process. No longer are they entitled to controlling weight. In its fifth edition of the *Diagnostics and Statistical Manual of Mental Disorders*, the American Psychological Association removed the GAF scale as a measurement tool. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders (DSM–V)* 16 (5th ed. 2013). Consequently, the SSA instructed ALJs not to give controlling weight to a GAF score from a treating source unless it is supported and uncontradicted by other evidence. AM 13066, *Global Assessment of Functioning (GAF) Evidence in Disability Adjudication* (Soc. Sec. Admin., July 22, 2013).

Though a GAF score is not entitled to controlling weight, it is still evidence to be considered. The instruction to give controlling weight to GAF scores only if they are supported and uncontradicted by other evidence necessarily requires the ALJ to weigh the GAF scores with the other evidence.

There may be cases where the objective medical evidence is so probative and uncontradicted that discussion of the GAF score is not necessary. In that case, a failure to discuss the GAF score is harmless because it would not affect the outcome.

Here, the ALJ did not ignore the GAF scores. Cipolla acknowledges that the ALJ did mention seventeen of the twenty-six GAF scores in the record. Contrary to Cipolla's contention, the ALJ did consider all the scores. He may not have addressed each score separately, but he did look at the range of the scores.

Throughout his relevant medical history, Cipolla's GAF scores have ranged between 40 and 50, except during hospitalizations.[39] The ALJ found that the record did

---

[39] *See, e.g.*, R. at 225, 270, 298, 302, 382, 392, 513.

not support marked restrictions corresponding to his GAF scores. He pointed to Cipolla's normal mental status examinations, improved mood, and ability to utilize public transportation, and spend significant amounts of time with other individuals in a shelter.[40] In short, the ALJ explained why he discounted the significance of Cipolla's GAF scores.

The ALJ did not ignore the two marked dips in Cipolla's GAF scores during his hospitalizations. Rather, he noted that the two episodes of decompensation were brief and Cipolla's scores returned to his "normal range" by the discharge date.[41] More importantly, the ALJ did not fully discredit the functional limitations suggested by the scores themselves. In recognizing Cipolla's social anxiety, the ALJ limited the types of work he could perform to those requiring little interaction with others.[42] He also restricted job responsibilities to simple, routine tasks.[43] The ALJ clearly considered and weighed Cipolla's GAF scores, and discussed the impact of those scores upon his ability to work. Therefore, we conclude that the ALJ properly considered and weighed the GAF scores.

### Medical Opinion Evidence

Cipolla argues that the ALJ's findings were skewed by his improper weighing of the medical opinions. Cipolla complains that the ALJ should have afforded significant, if not controlling, weight to the opinions of his treating physicians. He also objects to the

---

[40] ALJ Op. at 19–20.

[41] *Id.* at 20.

[42] *Id.*

[43] *Id.*

ALJ having given significant weight to the medical opinion of a non-examining physician.

The ALJ gave significant weight to the opinion of Sandra Banks, a non-examining source.[44]  At the same time, he accorded little weight to those of treating physicians and examining non-treating sources.[45]  In doing so, he explained that the medical records and Cipolla's lack of credibility did not support the opinions of the treating physicians.  The ALJ appears to have taken Banks' findings regarding Cipolla's restrictions and presented them as his own.  In sum, he gave significant weight to the non-examining consultant, who is not a medical doctor or psychiatrist, while assigning little or no weight to the treating physicians.

The ALJ's reliance on Banks' opinion was misplaced because it was based on a partial review of the medical records and did not take into consideration the opinions of Cipolla's treating physicians.  Furthermore, Banks cites the records and opinions of Dr. Robin Lowey and Associates, which are not mentioned in the ALJ's decision. Significantly, Banks assigned "great weight" to the May 7, 2013 opinion of Lowey and Associates.[46]  There is nothing in the record to identify Lowey and Associates as either a treating, an examining and non-treating, or a non-examining medical source. Consequently, we do not know what opinion Banks considered worthy of "great weight" and, more importantly, whether it was entitled to any weight.

---

[44] *Id.* at 21–22.

[45] *Id.* at 20–21.

[46] R. at 72.

A treating source, defined as one who has or had an ongoing treatment relationship with the claimant, is an acceptable medical source. 20 C.F.R. § 416.927(a)(2). A doctor need not treat the claimant for a specific length of time in order to qualify as a treating physician. *Id.* (stating that the length of treatment required for a "treating source" depends upon the claimant's condition). An examining, non-treating source used by the claimant solely to obtain a report in support of a disability claim is also an acceptable medical source. *Id.* So, too, is a non-examining source, one who has not examined the claimant, but has provided an opinion, such as a state agency reviewing doctor. *Wilson v. Colvin*, 218 F. Supp. 3d 439, 446 n.9 (E.D. Pa. 2016).

The weight to be given medical opinions is determined on a sliding scale, depending on the source's relationship with the claimant. The treating physician's opinions are assigned substantial, if not controlling, weight. An examining, non-treating physician's opinion receives less weight than a treating physician's, but more than a non-examining source.

The opinions of a treating physician are entitled to substantial and, in some cases, controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 202 (3d Cir. 2008) (quoting *Fargnoli*, 247 F.3d at 43). Controlling weight is only warranted when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; 20 C.F.R. § 416.927(c)(2). The treating physician's opinions should be given "great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting *Morales*

*v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).  The longer and more frequently the treating source has treated a claimant, the more weight her medical opinion deserves.  20 C.F.R. § 416.927(c)(2)(i).

A treating source's opinion may be rejected when it is contradicted by the medical evidence.  *Plummer,* 186 F.3d at 429.  The treating source opinion is accorded less than controlling weight where it is inconsistent with the record and the doctor's own treatment notes.  20 C.F.R. § 416.927(c)(4); *see Smith v. Astrue,* 359 F. App'x 313, 316 (3d Cir. 2009); *Salerno v. Comm'r of Soc. Sec.*, 152 F. App'x 208, 209–10 (3d Cir. 2005); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

When the ALJ rejects or accords little weight to the treating physician's opinion, he must adequately explain his reasons for doing so.  *Fargnoli*, 247 F.3d at 43 (citing *Burnett*, 220 F.3d at 121).  The ALJ may not make " 'speculative inferences from medical reports,' " and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion."  *Morales*, 225 F.3d at 317–18 (citations omitted).  In other words, the ALJ may not substitute his lay opinion for the medical opinion of a treating physician, especially in cases involving mental disabilities. *Id.* at 319.

Whether a non-treating source examined the claimant determines the weight to be given his or her opinion.  Opinions from a non-treating, examining source is generally given more weight than those from a non-examining source.  20 C.F.R. § 416.927(c)(1). The weight given to a non-examining source depends on the degree to which she provides supporting explanations for her opinions.  *Id.* § 416.927(c)(3).

Because a non-examining state agency consultant is deemed an expert in Social Security disability programs, her opinions may be accorded significant consideration. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); SSR 96–6p, 1996 WL 374180 (July 2, 1996). Her opinions may be entitled to greater weight than the opinions of treating or examining sources if based on a review of the entire medical record that includes a specialist's medical report. SSR 96–6p. For example, more weight is warranted when the opinion is based on a review of a complete case record containing a more comprehensive medical report than what was available to the treating source. *Id.*

No matter who the source is and what the opinion is, the ultimate issue of disability is a determination reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1); *Chandler*, 667 F.3d at 361 ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). Consequently, the ALJ need not accept, without question, any physician's opinion on a claimant's disability. When the ALJ chooses to credit one doctor's opinion over another's, he must explain the reasons for discounting the rejected evidence. *Diaz*, 577 F.3d at 505–06. He may not reject evidence for no reason or the wrong reason. *Id.*

### *Treating Physicians*

Cipolla argues that the ALJ did not assess the opinions of physicians at NHS and Mercy Fitzgerald Hospital as those of treating physicians.[47] As a result, he claims, the ALJ did not give their opinions the weight he should have.[48]

---

[47] *See* Pl.'s Obj. at 15–16; Pl.'s Br. in Supp. of Req. for Review (Pl.'s Br.) (Doc. No. 12) at 17.

[48] *See* Pl.'s Obj. at 15; Pl.'s Br. at 15.

*Mercy Fitzgerald Hospital*

Cipolla argues that Drs. Lee Silverman, Shelly Oxenhorn, and Douglas Kovatch were treating physicians whose GAF scores should have been given greater weight.[49] Dr. Kovatch treated Cipolla when he was an inpatient at Mercy Fitzgerald Hospital in January 2013.[50] Two days after Cipolla's admission, he recorded a GAF score of 20, and then a score of 50 at discharge.[51] Drs. Silverman and Oxenhorn treated Cipolla during his hospitalization at Mercy Fitzgerald Hospital in July 2014.[52] Dr. Silverman recorded a GAF score of 30 upon Cipolla's admission.[53] Five days later, Dr. Oxenhorn gave him a GAF score of 45.[54]

A physician need not be engaged for a specific amount of time to be considered a treating physician. 20 C.F.R. § 416.927(a)(2). Nevertheless, the weight given to a treating physician's opinion will vary depending on length and consistency of treatment. *Id.* § 416.927(c)(2). Hospital physicians, even though they may only see the claimant once or briefly, are treating physicians. They actually treated and examined the claimant. They are neither non-treating nor non-examining physicians under the Regulations. Thus, their opinions, so long as they are not contradicted by or inconsistent with other evidence in the record, deserve more weight than non-examining, non-treating physicians.

---

[49] *See* Pl.'s Br. at 15–17.

[50] R. at 299.

[51] *Id.* at 299, 302.

[52] *Id.* at 511–14, 534–44.

[53] *Id.* at 513–14.

[54] *Id.* at 544.

The Third Circuit recognizes that hospital and outpatient records are reports from treating physicians. *Purter v. Heckler*, 771 F.2d 682, 698–99 (3d Cir. 1985). Courts in this district consider hospital physicians as treating physicians. *See, e.g.*, *Rodriguez v. Astrue*, Civ. A. No. 06-4063, 2009 WL 223586, *5 (E.D. Pa. Jan. 29, 2009) (evaluating the medical opinions of claimant's doctors during hospitalizations as treating physicians); *Antes v. Bowen*, Civ. A. No. 85-5325, 1986 WL 6214, at *2 (E.D. Pa. May 30, 1986), *aff'd*, 815 F.2d 693 (3d Cir. 1987) (referring to claimant's hospital physician as "claimant's treating physician during the hospitalization").

Drs. Oxenhorn, Silverman, and Kovatch were Cipolla's treating physicians during his hospitalization, but their medical opinions were not entitled to great weight. They did not offer opinions regarding Cipolla's functional limitations. Instead, they recorded GAF scores, which we have already noted do not have the significance in the social security disability context they once had.

The Mercy Fitzgerald physicians had a limited treatment window. They did not examine Cipolla after discharge. The Social Security Regulations assign more weight to medical opinions from treating sources who can provide a longitudinal picture of medical impairments than to those based upon a brief hospitalization. 20 C.F.R. § 416.927(c)(2). Because Drs. Silverman, Oxenhorn, and Kovatch each treated Cipolla for less than a week, they did not have the long-term relationship which would warrant giving their opinions controlling or substantial weight. *See Rodriguez*, 2009 WL 223586, at *5 (holding the ALJ provided a valid reason for giving less weight to the opinions of claimant's treating physicians from his recent hospitalizations because he was only hospitalized for short periods of time).

*Northwestern Human Services*

Cipolla had been treated at NHS long enough to draw a longitudinal treatment picture. NHS physicians created records containing all the relevant medical history and treatment notes. Each physician there had access to Cipolla's medical records and was relying on his or her associates' observations, notes, and opinions. Regardless of how many times they examined him, Dr. Bhatti, Dr. Petrovic, Dr. Graff, and Dr. Oo, all of whom treated Cipolla at NHS, were his treating physicians.

Physicians treating a patient within a practice share treating physician status with those in the same practice. *See Shukher v. Chater,* Civ. A. No. 95-4461, 1996 WL 417195, at *3 (E.D. Pa. July 16, 1996) (finding that psychiatrists who only presented limited or consultative evaluations were still treating sources where the plaintiff had received ongoing treatment from them and their employing agency); *cf. Purter*, 771 F.2d at 698–99 (treating medical reports from a hospital emergency room and outpatient clinics as the functional equivalent of reports of treating physicians warranting substantial weight); *Simms v. Schweiker*, 552 F. Supp. 415, 417–18 (E.D. Pa. 1982) (remanding, in part, for the ALJ's failure to explain the diminished weight accorded to reports from agencies that provided treatment to plaintiff for several years).[55] How

[55] Courts outside this district are split. *Compare Weiler v. Soc. Sec. Admin.*, Civ. A. No. 3:14-1347, 2015 WL 5341939, at *7 (M.D. Tenn. Sept. 14, 2015), *report and recommendation adopted*, Civ. A. No. 3-14-1347, 2015 WL 5821252 (M.D. Tenn. Oct. 5, 2015) (rejecting plaintiff's argument that a physician who examined plaintiff only one time was a treating source even though the physician practiced in the same medical center plaintiff had used for over a year); *Tracy v. Astrue*, Civ. A. No. C11-3072-MWB, 2012 WL 6743537, at *10 n.4 (N.D. Iowa Dec. 28, 2012), *report and recommendation adopted*, Civ. A. No. C 11-3072-MWB, 2013 WL 452824 (N.D. Iowa Feb. 6, 2013) (holding that a physician who examined plaintiff one time was not a treating source despite practicing at the same place as the actual treating source); *Rice v. Astrue*, Civ. A. No. 07-39-P-S, 2007 WL 3023546, at *3 (D. Me. Oct. 12, 2007), *report and recommendation adopted*, Civ. A. No. 07-39-P-S, 2007 WL 4117785 (D. Me. Nov. 15, 2007) (refusing to acknowledge that a physician who never examined plaintiff was plaintiff's treating source simply because he was part of the same medical practice as plaintiff's treating orthopedist), *with Lawson v. Colvin*, 21 F. Supp. 3d 606, 612 (W.D. Va. 2014) (holding that a physician who only examined plaintiff twice was still a treating physician because he was part of the same group of

much weight to assign their opinions depends on when and how often during the course of treatment the opining physician examined and treated the claimant.

*Dr. Jamil Bhatti*

Dr. Bhatti, who is not mentioned by name in the ALJ's opinion, recorded a GAF score of 50 when he examined Cipolla at his first visit to NHS.[56] Cipolla argues that the ALJ should have given Dr. Bhatti's recorded GAF score controlling weight as a treating physician opinion.[57]

We have already discussed the limited value of a GAF score. Alone, it does not require the deference Cipolla argues it does. Dr. Bhatti had no baseline against which to compare Cipolla's symptoms upon presentation. "A one-time examination does not generate the longitudinal record and experience with a claimant's condition which justifies the provision of great weight to a medical opinion." *Niglio v. Colvin*, Civ. A. No. 12-1583, 2013 WL 2896875, at *9 (W.D. Pa. June 13, 2013); *see also Feeney v. Berryhill*, Civ. A. No. 15-CV-3838, 2017 WL 2544587, at *5 (E.D. Pa. June 13, 2017) (holding that the ALJ was not required to give a doctor who examined plaintiff one time the deference owed to a treating physician). Though Dr. Bhatti continued to treat

---

physicians who had treated plaintiff for years and had full access to all the treatment records); *Fry v. Astrue*, Civ. A. No. 1:11-CV-657, 2012 WL 5830246, at *5 (S.D. Ohio Nov. 16, 2012), *report and recommendation adopted sub nom. Fry v. Comm'r of Soc. Sec.*, Civ. A. No. 1:11CV657, 2012 WL 6738661 (S.D. Ohio Dec. 31, 2012) (recognizing that plaintiff had an "ongoing treatment relationship" with a doctor who practiced at the clinic plaintiff visited regularly for therapy sessions and additional examinations with the same doctor); *Knaub v. Astrue*, Civ. A. No. 4:08-CV-1319, 2009 WL 89435, at *12 (M.D. Pa. Jan. 13, 2009) (finding that a doctor was a treating physician where he explicitly wrote in a letter that he and the therapist worked together as a treatment team within the same office, he held responsibility for the therapists' work, and also spoke to the plaintiff several times).

[56] R. at 223–25; ALJ Op. at 15.

[57] Pl.'s Br. at 15–17; Pl.'s Obj. at 16.

Cipolla afterwards, he did not provide subsequent medical reports.[58]  Therefore, although he may be considered a treating physician, his opinion is not entitled to controlling weight.

*Dr. Marija Petrovic*

The ALJ failed to mention NHS physician Dr. Marija Petrovic by name.  Rather, he summarized her medical report dated August 24, 2011, where she recorded a GAF score of 45.[59]  Although Dr. Petrovic later examined Cipolla numerous times, she did not assign additional GAF scores or opine on his functional capabilities.[60]  The ALJ mentioned her observations during those subsequent medical evaluations.  He noted that Cipolla's mental status examinations with Dr. Petrovic were relatively normal, despite his depressed and anxious mood.[61]  The ALJ also discounted Dr. Petrovic's and the other recorded GAF scores because Cipolla's treatment notes did not support marked restrictions.[62]

Cipolla asks us to give Dr. Petrovic's recorded GAF score controlling weight as a treating physician opinion.  Her recorded GAF score is not entitled to controlling weight.  Nevertheless, Dr. Petrovic, having seen Cipolla six times at NHS, was a treating physician whose opinions in the treatment notes should have been considered and accorded substantial weight.

---

[58] R. at 588, 629.

[59] *Id.* at 298; ALJ Op. at 16.

[60] *See* R. at 401–13.

[61] ALJ Op. at 16.

[62] *Id.* at 20.

*Dr. Harold Graff*

Sandra Banks, whose opinion the ALJ accorded significant weight, viewed Dr. Graff as Cipolla's treating physician.[63] The ALJ even characterized Dr. Graff as "claimant's psychiatrist at the time."[64] Nevertheless, the ALJ gave Dr. Graff's opinion little weight because, as he explained, he did not provide a function-by-function analysis of Cipolla's residual functional capacity in his disability assessment form, and his opinion was inconsistent with the evidence regarding Cipolla's symptoms and credibility.[65] The ALJ referenced "largely normal" mental health examinations and discrepancies with Cipolla's alleged symptoms and behavior. He also cited to Cipolla's therapy examinations in which he reported improved depression symptoms.[66]

Dr. Graff completed a disability welfare form on January 28, 2013, in which he indicated that Cipolla suffered from major depressive order and was temporarily disabled from January 14, 2013 until January 13, 2014.[67] By that time, Cipolla had been treating at NHS for over two years. Dr. Graff had also personally seen Cipolla at least twice, completed a comprehensive psychological re-evaluation, and ordered hospitalization on January 14, 2013 for suicidal ideation.[68] Because he had an established treatment relationship with Cipolla and was part of the NHS practice group, Dr. Graff was a treating physician.

---

[63] *See* R. at 68, 74.

[64] ALJ Op. at 20.

[65] *See id.* at 20–21.

[66] *Id.*

[67] R. at 355.

[68] *Id.* at 387–92, 397–98.

His opinion deserved greater weight. Certainly, a treating physician's determination that a claimant is disabled is not dispositive. However, Dr. Graff's opinion finds support in the record. His January 14 evaluation notes indicated Cipolla was hostile, suicidal, and unable to deal with life stresses.[69] Cipolla was admitted to Mercy Fitzgerald Hospital that same day.[70] The evaluation also referenced Cipolla's prior diagnosis of major depressive disorder, which remained unchanged upon Dr. Graff's examination.[71]

### Dr. Nwe Oo

Dr. Oo saw Cipolla on August 13, 2013 after he had been examined by Drs. Petrovic and Graff at NHS multiple times.[72] She had the benefit of the medical records, which revealed his treatment history, his condition over time, and his limitations. In her assessment, Dr. Oo recorded Cipolla's January 2013 evaluation with Dr. Graff and subsequent hospitalization for suicidal ideation as part of her patient's psychiatric history.[73] Unlike Dr. Bhatti, Dr. Oo was starting with a treatment history and record. She had Dr. Graff's prior notes and Cipolla's hospital records.

Dr. Oo's functional assessment was made on her first examination. In that assessment, Dr. Oo found that Cipolla suffered from marked to extreme limitations in his ability to function independently, appropriately, and effectively in a work setting.[74]

---

[69] *Id.* at 391.

[70] *Id.* at 299, 391.

[71] *Id.* at 387, 392.

[72] *Id.* at 385–92, 401–13, 510.

[73] *Id.* at 377.

[74] *Id.* at 510.

She also recorded a GAF score of 45.[75]  Dr. Oo later examined Cipolla twice.  On those visits, although Cipolla showed improvement, he still suffered from depression.   In October 2013, Dr. Oo noted that her patient, despite being cooperative and appearing "less helpless," was depressed.[76]  Dr. Oo's December 2013 report likewise indicated that Cipolla's depression, though improving, was recurrent.[77]

Here, the ALJ concluded that Dr. Oo's opinion rendered on Cipolla's initial visit was inconsistent with the record and his credibility.[78]  Dr. Oo reviewed Cipolla's prior medical records and examined him before concluding Cipolla suffered from work-preventative limitations.  She also had access to those same records when she saw Cipolla twice afterwards.

Dr. Oo's opinion was, at least, entitled to some weight.  Instead, the ALJ dismissed Dr. Oo's opinion outright, even though it was not contradicted by the NHS records.

### Non-Treating, Examining Physicians

Dr. Ujwala Dixit, a state agency examining psychologist, rendered a medical opinion in October 2011 in which she recorded a GAF score of 50.[79]  In that same evaluation sheet, Dr. Dixit noted that Cipolla's daily living activities had declined significantly.  She indicated impairments to his abilities to prepare meals and grocery

---

[75] *Id.* at 382.

[76] *Id.* at 367–68.

[77] *Id.* at 650.

[78] ALJ Op. at 21.

[79] R. at 265, 270.

shop, despite finding no impairment in Cipolla's ability to understand instructions.[80]  Dr. Dixit also diagnosed Cipolla with major depressive disorder.[81]  The ALJ gave Dr. Dixit's medical opinion little weight because he considered it incomplete and rendered without the benefit of reviewing the entire record.[82]

The ALJ gave limited weight to the May 2013 functional limitation assessment of state examining psychologist Noa Glick.[83]  Glick found Cipolla markedly impaired in his ability to work.[84]  She cited Cipolla's significant depression and poor coping tools as reasons for her assessment.[85]  However, the ALJ found her opinion to be inconsistent with the record.[86]

Dr. Dixit and Glick are non-treating physicians who only examined Cipolla once. 20 C.F.R. § 416.927(a)(2).  Their reports reflected observations of Cipolla's condition at that one point in time.  As non-treating examining physicians, their opinions were not entitled to the same weight as those of treating sources.  Nevertheless, Dr. Dixit's and Glick's opinions should have been accorded greater weight than the opinion of Banks, the non-examining consultant.  Unlike Banks, they based their reports on an examination of Cipolla, not just a partial review of his medical records.  *See* SSR 96-6p.

---

[80] *Id.* at 258, 263–64.

[81] *Id.* at 261.

[82] ALJ Op. at 21.

[83] *Id.*

[84] R. at 361, 364–65.

[85] *Id.* at 365.

[86] ALJ Op. at 21.

### *Non-Examining Physician*

The ALJ gave the opinion of Sandra Banks, the only non-examining source, significant weight.[87]  He concluded that Banks' opinions were more consistent with the record as a whole and with Cipolla's reported activities.[88]

Banks determined that Cipolla had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and concentration.  She found that Cipolla had limited ability to understand complex instructions, concentrate for extended periods of time, and respond appropriately to criticism.  But, she also noted, he could understand and carry out simple instructions.[89]  Based on these findings, Banks opined that Cipolla could function in production-oriented jobs requiring little independent decision-making.[90]  She also concluded that Cipolla could maintain regular attendance at a job without special supervision as long as his work was basic and repetitive.[91]

Banks' functional capacity assessment was based on a limited review of Cipolla's medical records, those from Mercy Fitzgerald Hospital, Dr. Graff, and Dr. Dixit.[92]  She did not consider reports from Cipolla's other treating physicians.  Significantly, she assigned "great weight" to the opinion of a non-treating source, Lowey and Associates, which is not identified in the record.

---

[87] *Id.* at 22; *see also* Pl.'s Obj. at 18.

[88] ALJ Op. at 21–22.

[89] R. at 73.

[90] *Id.* at 74.

[91] *Id.*

[92] *See id.* at 66–69.

Because there is no report or other reference to Lowey and Associates, we do not know what Lowey's findings and opinions, if any, were. What we know is that Lowey was not a treating source. More importantly, the ALJ does not refer to or discuss Lowey in his decision. Hence, it is not possible to assess what weight should have been given to Banks' opinion, which relied upon Lowey.

The only document referring to Lowey and Associates is a two-page report over the signature of Noa Glick and bearing a facsimile header "Robin Lowey and Associates." There is no indication that Glick is associated with Lowey or why the document appears in the fax. Indeed, in her report, Banks refers to Lowey as a "non-treating source" and Glick as an "examining source."[93] Thus, it appears there is no relationship between the two.

The ALJ accorded limited weight to Glick's opinion because he found that it was not consistent with the record.[94] Yet, he gave significant, if not controlling, weight to Banks' opinion, which rested for the most part on Lowey's unknown opinion.[95] This discrepancy cannot support the ALJ's findings and conclusion.

We conclude that the ALJ inappropriately gave significant weight to the non-examining consultant while assigning little or no weight to treating physicians' and examining physicians' opinions.

## Conclusion

Because the ALJ did not accord the appropriate weight to the opinions of the various sources and improperly relied on a non-examining consultant who based her

---

[93] *Id.* at 66, 74.

[94] ALJ Op. at 21.

[95] *Id.* at 22.

opinion on another source whose opinion is not found or supported in the record, we shall remand this matter to the Commissioner.